## Case No. 11,220.

### PLATT v. STEWART et al.

[13 Blatchf. 481.] [1]

Circuit Court, S. D. New York. Aug. 16, 1876. [2]

INSOLVENCY—PRIORITY OF CLAIMS — CONVEYANCE TO SECURE DEBTS—EXECUTION LIENS—VALIDITY AS AGAINST ASSIGNEE IN BANKRUPTCY—RECORDING CHATTEL MORTGAGE—STATEMENT OF INTEREST AND DESCRIPTION OF PROPERTY.

1. Evidence considered, as to whether a debtor was insolvent at the time he conveyed certain real estate to a creditor, to apply on a debt due to such creditor, and as to whether the creditor had reasonable cause, at the time, to believe that such insolvency existed.

2. L. owned the furniture in a hotel, upon which furniture he had given chattel mortgages to S., the owner of the hotel as security for the rent of the hotel. L. becoming insolvent, executions were levied on such furniture under judgments recovered after the giving of such mortgages. Subsequently, L. was adjudged a bankrupt, and his assignee in bankruptcy brought this suit against S. and the execution creditors, to set aside the mortgages and the judgments and to have awarded to him the proceeds of the furniture. The court set aside the mortgages, but awarded the proceeds of the furniture to the execution creditors.

3. Liens by execution upheld as valid, as against an assignee in bankruptcy of the debtor, where the judgments were for just debts, due and payable, and were obtained not only without the slightest aid or concurrence of the debtor, but generally in spite of his active and unjustifiable opposition.

4. Under the statute of New York in regard to the filing of chattel mortgages (Laws N. Y. 1833, p. 402, c. 279, § 2; Act April 29, 1833), where the mortgagors in a chattel mortgage resided in Westchester county, and not in the city of New York, and the mortgage was filed in the latter place, and not in the former: Held, that the mortgage was void as against creditors of the mortgagor, represented by his assignee in bankruptcy.

[Cited in Crampton v. Jerkowski, 2 Fed. 493.]

5. Under section 3 of the same act, in regard to the refiling of a copy of the mortgage, "together with a statement exhibiting the interest of the mortgagee in the property thereby claimed by him by virtue thereof," a statement in regard to a mortgage given as security for rent to accrue on a lease of real estate, merely said:

"I hereby certify that the lease within referred to still exists in full force, and the interests of the parties, and my interests, thereunder remain unchanged, except so far as the same have been altered by the payment of rent accrued:" Held, that such statement was insufficient.

6. The mortgage, a copy of which was refiled with such statement, described the property it covered by referring to a schedule annexed to it, and a copy of such schedule was refiled with the copy of the mortgage. The schedule described the property only as the goods and chattels described in a prior mortgage made by the mortgagors to the mortgagee, and in the schedule thereto attached, and filed in a certain office at a certain date, and all other goods and chattels in a certain building: Held, that, under section 3 of said act, such description of the property was not a sufficient statement of the property remaining subject to the mortgage at the time of such refiling.

7. The lessees having agreed by the lease to give to the lessor, as security for the accruing rent, a chattel mortgage, and to renew and extend it, from time to time, "as shall be necessary to effect that purpose," and that such mortgage "shall be a continuing lien and security for the payment of such rent," and the mortgages given being held void as against creditors: Held, that such agreement in the lease did not secure to the lessor, aside from a lien by a valid mortgage, any lien as against other creditors who were in a condition to contest his lien.

8. The mortgage being void as to creditors, no title to the mortgaged property passed to the mortgagee by reason of a failure to pay the rent, so as to cut off any right creditors would otherwise have to contest the mortgage.

9. Held, also, that this action was well brought by the assignee in bankruptcy, and could be maintained (1st), because, by section 35 of the bankruptcy act of March 2d, 1867 (14 Stat. 534), he is expressly empowered to bring an action to recover property fraudulently conveyed by the bankrupt; (2d), that, there being creditors who had liens on the personal property covered by the chattel mortgages, the assignee might maintain the action as representing them, although he denied the validity of their liens; and (3d), that, the assignee having an unquestioned standing in court as to a portion of the fund, it is proper that all the trust fund, and the conflicting claims to it before the court, and which must ultimately be decided by it, should be passed upon in this suit.

[This was a bill in equity by John H. Platt, assignee in bankruptcy of Simeon Leland & Co., against Alexander T. Stewart and others. For a hearing on the subject of compensation of sheriff, see Case No. 11,221.]

Dennis McMahon, for plaintiff.
Henry E. Davies, for Stewart.
Alexander H. Dana, for Miller & Conger.
John J. Thomasson, for Oechs & Co. and Batjer & Co.

HUNT, Circuit Justice. On the 24th of March, 1871, a petition in bankruptcy was presented by George F. Bellows, a creditor, praying for an adjudication of bankruptcy against Simeon Leland & Co., a firm composed of Simeon Leland, Charles Leland, and Warren Leland. On the 1st of April following, the adjudication was made as prayed for.

S. Leland & Co. had, for several years, been the keepers of the Metropolitan Hotel, in the

---

[1] [Reported by Hon. Samuel Blatchford. District Judge, and here reprinted by permission.]

[2] [Reversed in 101 U. S. 731.]

city of New York, under a lease from Alexander T. Stewart, and used and owned in the said hotel a large amount of furniture and other property. At the time of the bankruptcy, they were holding under a lease to expire on the 1st of May, 1871, at an annual rent of $79,186, payable monthly on the first day of each month. The lease under which the Lelands carried on the hotel was dated April 30th, 1867, and contained the following provision: "And upon further condition, that the parties of the second part shall, simultaneous with the execution and delivery thereof, execute and deliver to the party of the first part a first mortgage and lien upon all the furniture and chattels of every kind now contained in said hotel, and used by the parties of the second part for hotel purposes, and which mortgage or lien shall be a security for the payment of the rent hereby reserved; and, on any default in the payment of such rent according to the terms of this instrument, the party of the first part may at once proceed to foreclose said mortgage or lien, and collect the amount of such rent from the sale of the property described or referred to in said mortgage or lien; and also upon the further condition, that the said parties of the second part shall, every year during the said term, and within thirty days prior to each 30th day of April therein, execute and deliver to the party of the first part a renewal of said mortgage or lien, and also an additional mortgage, which shall be a first lien, from the day of delivery thereof, upon all the additional furniture and chattels of every kind then contained in said hotel, and used by the parties of the second part for hotel purposes, and not covered by the said first mortgage, and, on any default in the payment of the rent hereby reserved, the party of the first part may proceed to foreclose such mortgages and collect the amount of such rent remaining unpaid, from the sale of the property in said mortgages described or referred to; and if, at any time during such term, the said parties of the second part shall fail or neglect to so execute and deliver to the party of the first part any such renewal, or additional mortgage or lien, then, and in such case, it is hereby expressly and mutually covenanted and agreed by and between the parties hereto, that the yearly rent reserved hereby shall thereafter be and become due and payable in advance on the first day of May in each remaining year of the term hereby demised, and the mortgage or mortgages held by the party of the first part at any time during the term hereby demised may be resorted to for the collection of the rent which shall at any time become due and be unpaid hereunder, whether payable in advance or otherwise, and, to that end, said mortgage or mortgages shall be a continuing lien and security for the payment of the rent hereby reserved." In performance of the covenants of this lease, on the 30th of April, 1867, the lessees executed to Mr. Stewart a chattel mortgage, covering all the furniture in said hotel, of which an inventory was annexed, to secure the payment of the rent reserved. The inventory purported to give, in detail, a statement of the furniture in every room in the house. This mortgage was filed on the 2d of September, 1867, in the office of the register of deeds of the city and county of New York. Other mortgages, or copies, were made and filed April 30th, 1868, and June 22d, 1869, to which it is not necessary particularly to refer. A chattel mortgage between the same parties, and for the same purpose, dated April 30th, 1869, acknowledged August 2d, 1869, was filed on the 4th of August, 1869. It is upon this mortgage, and its renewal, filed July 8th, 1870, that the questions respecting the validity of the mortgage security arise.

The chattel mortgage dated April 30th, 1869, purports to transfer "all the household and hotel furniture and chattels belonging to us, and all other goods and chattels mentioned in the schedule hereto annexed, and now in the building known as the Metropolitan Hotel, * * * to have and to hold," &c. The schedule referred to was as follows: "Schedule referred to in the within chattel mortgage—All the goods and chattels described in, and referred to in, a certain chattel mortgage, dated April 30th, 1867, made by us to said Stewart, and also in the schedule attached thereto, filed in the register's office of the city of New York, on or about September 2d, 1867, together with all other household or hotel furniture, goods or chattels, of every description, belonging to us, and now in or upon the building known as the Metropolitan Hotel, on Broadway, Prince and Crosby streets, in the city of New York." On the 8th of July, 1870, a copy of this mortgage, with the schedule attached, was filed in the office of the register of the city of New York, and upon such copy was endorsed the certificate following: "I hereby certify that the lease within referred to still exists in full force, and the interests of the parties, and my interests, thereunder remain unchanged, except so far as the same have been altered by the payment of rent accrued. Dated New York, July 8th, 1870. Alex. T. Stewart." On the 1st of July, 1870, the lessees failed to pay the rent due on that day, and, from that time until their bankruptcy, were in arrear, never thereafter paying the rent when due. On the 8th of July, 1870, the date of the last refiling, the amount in arrear was $32,994 15. At the time of executing these mortgages and the renewals, the mortgagors, and each of them, were residents of towns in the county of Westchester, New York, and neither of them was a resident of the city of New York. The question of the lien secured by the lease, and the questions arising upon the chattel mortgages, will be considered hereafter.

On the 24th of January, 1871, a deed of two houses and lots on Crosby and Jersey

streets, in the city of New York, executed by Charles Leland, was delivered to Mr. Stewart. There was then rent in arrear to the amount of $61,001 43. Houses, numbers 137 and 139 Prince street, were conveyed by Charles Leland to Mr. Stewart, by deed acknowledged on the 13th of February, 1871. The Thomas farm was conveyed to Mr. Stewart by Ellen Leland, by deed acknowledged on the 4th of February, 1871. The validity of these conveyances, and of the chattel mortgages to Mr. Stewart, is impeached by the assignee.

I will consider, first, the questions arising upon the conveyances of the real estate. The assignee insists that these pieces of property were conveyed by the bankrupts, or caused by them to be conveyed, to Mr. Stewart, within four months preceding their bankruptcy, by way of an unlawful preference to him on account of a large indebtedness for rent of the Metropolitan Hotel, and in fraud of the provisions of the bankrupt act. The conveyances were, confessedly, made within the four months specified. The title of the two houses and lots on Crosby and Jersey streets was in Charles Leland. The property was encumbered to $8,000, and was worth $30,000. Its net value was $22,000. This property was in fact owned by the firm, but was kept in the name of Charles, who was a single man. The purpose is a matter of some doubt. The Thomas farm, in Westchester county, stood in the name of Warren Leland's wife, but was, in fact, owned by him. This farm was of the value of $27,500, and was encumbered to $8,000, its net value being $19,500.

The questions to be determined are: (1) Were the Lelands in an insolvent condition when these conveyances were made? (2) Had Mr. Stewart, or his agent, Mr. Hilton, reasonable cause to believe them to be thus insolvent when the conveyances were taken?

On the first point, it is shown that the debts proven in bankruptcy against the firm of S. Leland & Co. amounted to $286,000, and the debts against Leland Brothers, (Warren and Charles,) to $181,166. The debts proved against Warren Leland, individually, amounted to $104,139, but the assignee states that he had not then determined whether they were valid claims. The assignee also testifies that he has received nothing from the estate of S. Leland & Co., not even enough to pay his expenses, and that, in his opinion, after paying prior liens and incumbrances, there will be nothing left for the payment of the general creditors of S. Leland & Co. So far as it appears, the value of the real estate conveyed to Mr. Stewart, and the proceeds of the sale of the furniture, hereafter to be considered, are the sole subjects of value that belonged to the estate, and these are the subjects of contention between conflicting incumbrancers. For the general creditor, there appears to be nothing to contend about.

The debt 'to Mr. Stewart for rent, as has been stated, was about $60,000 when the deeds were taken. This debt Mr. Stewart required to be paid, and he avers, in his answer, that he refused to treat for an extension of the lease of the hotel, (which would expire on the 1st of May, 1871), until this debt was paid in whole or in part. Warren Leland testifies that Mr. Stewart said he must be secured in the rent before he could talk about a new lease.

The testimony of Warren Leland indicates, that, for months previous to their bankruptcy, the firm had been engaged in a struggle to maintain itself. The struggle was manful and commendable. The question is, whether, in January and February, 1871, it had not become a desperate one. He says, that, as early as in the October previous, they had not money enough to pay their notes and checks, hardly enough to pay the running expenses of the hotel, which was constantly losing money; and that, when he came from Saratoga, in October, he found checks out which they could not meet, and checks and notes held over, which they could not get up. This, he says, continued to their bankruptcy. The firm had been frequently sued before this time, and had employed counsel to put in defences, for delay. One or two bankruptcy proceedings had been commenced against them, which they had disposed of by paying the debts. The record shows numerous judgments recorded against S. Leland & Co. Thus, $1,817, on two notes, one of them dated July 9th, 1870, one dated November 15th, 1870—suit commenced February 20th, 1871; also, $2,678 36, February 24th, 1871, on a note due December 1st, 1870, to which the delay of an answer had been interposed; also $801 01, February 7th, 1871, on a note due December 27th, 1870, summons served January 14th, 1871; also, a judgment, October, 1867, for $5,301 03, appealed, and judgment for costs on affirmance, and upon the original and the additional judgment executions were outstanding; a judgment, $1,089 15, March 14th, 1871, on a note dated July 9th, 1870, suit commenced January 4th, 1871, answer struck out as sham and frivolous; a judgment, $2,188 62, March 14th, 1871, answer struck out February 6th, 1871, as sham and frivolous; a judgment, $1,311 99, February 8th, 1871, answer struck out February 6th, 1871, as sham and frivolous; a judgment, November 12th, 1868, $676 94, for damages to a guest in loss of property, judgment affirmed by the court of appeals—executions issued upon both judgments before January 1st, 1871. Ten pages of the record are occupied in setting forth the record of suits and judgments, of which the above are specimens. In nearly all the cases the debts had become payable, and payment was neglected and refused, before January 23d, 1871. Mr. Leland's evidence shows that such refusal proceeded from inability to pay, and that they resorted to the usual expedient of

insolvent debtors, to wit, sham and frivolous defences, to procure delay. He shows, also, that numerous sheriffs' officers were quartered upon him, eating up his substance.

Evidence is given of the hope and expectation of the Lelands to sell their furniture, and an extension of their lease, to Mr. Risley, for $175,000. This expected sale was based upon a renewal of their lease for four years from May 1st, 1871. This renewal they never obtained, and, of course, it never became a proper subject of estimated value, as property. There was no reason to suppose that Mr. Risley would buy their furniture, unless he could also obtain an extended lease. If he had so desired, he could have accomplished it by attending the sale that was soon afterwards made. This furniture was estimated by one skilful man at $90,000, and by another at $47,000, and actually brought, at a sale expensively advertised and carefully conducted, the sum of $43,469 31. I think there can be no doubt, that, in January and February, 1871, the firm of S. Leland & Co. was irretrievably and hopelessly insolvent.

The next question is—Had Mr. Stewart, or his agent, Mr. Hilton, reasonable cause to believe that this insolvency existed, when the deeds in question were taken? The evidence is so voluminous that I do not undertake to state it, but content myself with a statement of results.

I cannot avoid the conclusion that Mr. Stewart and Mr. Hilton were more than willing to take this real estate in payment of the rent. It had accumulated to a very large amount. It was impossible for the Lelands to pay it except with this property. This real estate and the furniture mortgaged to Mr. Stewart constituted everything of value that they possessed. Their business was much depressed. They exhibited to Mr. Stewart and his agent a statement showing the falling off of their business to the extent of from $8,000 to $10,000 per month. The men who drank wine and indulged in extravagant expenditures, they said, did not now stop at the Metropolitan Hotel, but went further up town. To sell their furniture would be to end their business, and cut off all future payments. That these men were supposed to "live in palaces, and to drive four in hand," as Mr. Hilton states, would, under such circumstances, commend them to the favor of a prudent practical man like Mr. Stewart, is not to be credited. If this idea induced Mr. Hilton to omit all inquiry, and to believe them to be rich, it is to be observed, that Mr. Stewart nowhere confirms or approves this suggestion. His practical sagacity would scarcely permit it.

There were but two modes to be adopted by Mr. Stewart—First, to give indulgence, relying upon the security of his chattel mortgage; second, to obtain payment by means of the real estate. The result has shown, what any sagacious man well knows, that a chattel mortgage is the most precarious and uncertain of all securities for the payment of money. As a security upon property which wears out, which may suddenly disappear, and which is subject to more legal niceties than almost any other legal document, a chattel mortgage is seldom resorted to except in the absence of all other possibilities. I should be much surprised to learn that Mr. Stewart had ever, during his active business life, lent money on the security of a chattel mortgage, or received it for any purpose, when other security could be obtained. Leland testifies that Mr. Stewart stated to him that he did not consider the mortgage security as sufficient.

The manner in which this negotiation for the extension of the lease to the Lelands was conducted, is worthy of remark. A termination of the lease was fatal to the Lelands. They so understood it. The sale of the furniture could be well made with such extension, not at all without it. A threatening letter is written, requiring payment or that a lease will be made to other parties. This is done by Mr. Stewart's direction. A negotiation goes on in several interviews. Terms are discussed, varying from $52,000 per year to $70,000, as the rent, but nothing is decided. Mr. Stewart refuses to accede to any terms until the back rent is paid—in whole or in part, as he says—secured in the whole, as Warren Leland says. The inference from Mr. Stewart's testimony is, that this was not a preliminary condition, but, in his answer, he expressly so states, and Warren Leland testifies to the same purport. The only source from which such payment can be made or security given, is this real estate. The hope of the renewal was held out to the Lelands, until a conveyance was obtained of this property. The negotiation was then terminated with little ceremony, by the execution of a lease to Mr. Tweed. There is strong reason to think, both that Leland never would have conveyed this property except in the confidence that his lease would be renewed by Mr. Stewart, and that Mr. Stewart fully understood this expectation. It was the effort of a struggling debtor to obtain favor, and of a fearful creditor to obtain security.

Again, it may be asked, why did Mr. Stewart receive these conveyances? He testifies that he did not want the property, but he wanted the money for his rent. The Lelands, on the contrary, did want the New York property, as it was adjoining the hotel they occupied, and a convenient auxiliary to it. No property was ever before taken in payment of rent by Mr. Stewart from the Lelands. Why, then, did Mr. Stewart take this real estate? The alleged reason of saving expenses of search, brokerage and commission, if a sale should be made by Leland, and the money paid, is scarcely a good one.

If it was a purchase, a search would certainly be made by any prudent man, and it must be done through the means of a professional agent. No careful man would make a purchase for which he paid $43,000, except after an examination of title. The fact that no examination of title and no search was made, and that the party did not think the property worth the sum asked for it, goes strongly to show that the grantee was desirous to obtain the property on any terms, and was willing to take the risk of incumbrances. This is not an indication of a bona fide purchase.

Mr. Leland testifies that he told Mr. Hilton, at the interview at his house, that suits were being pressed against him, that Hilton asked if Fitch, the counsel, could keep them off, and Leland said that he could. This is denied by Mr. Hilton. The three Lelands agree in the general character of these statements.

Mr. Stewart and Mr. Hilton testify that they had no doubt of the responsibility of the Lelands at this time. They both knew, however, that the Lelands were largely in arrear for rent, and Mr. Stewart directed Mr. Hilton to write them officially in regard to it. Mr. Stewart states that he was anxious to collect the rent, and more than once directed Mr. Hilton to look after it. He states that he did not wish to make the purchase, but Mr. Hilton advised him to make it, and told him that he might as well accommodate them by making the purchase.

It requires some confidence to suppose that Mr. Stewart was willing to take, from a solvent debtor, property that he did not want, in payment of a good debt, and for the purpose of accommodating his debtor. Business men who act upon this principle seldom succeed in making large fortunes. It is difficult to suppose that Mr. Hilton gave this advice, or that Mr. Stewart acceded to it.

Mr. Stewart states that he made no personal inquiries as to the Lelands' responsibility, and had no personal knowledge of suits against them, and that he left everything to Mr. Hilton. Mr. Hilton testifies that he believed the Lelands to be in a "splendid" condition, and that he gave Mr. Stewart a "glowing account" of their affairs. The examination and the cross-examination of each of these witnesses is very protracted. Without impeachment of their veracity, it may be doubted whether their evidence is equal in weight to the direct testimony given, and to the circumstances of the case, to the contrary. This case was but one of the many large transactions in which those gentlemen were engaged, and of much less importance to them than to the Lelands. To the latter it was everything, and they may be expected to possess a more accurate recollection respecting it than others. In the present controversy they have no possible interest.

I am of the opinion that both Mr. Stewart

and Mr. Hilton had the reasonable cause to believe the Lelands insolvent, required by law, and that Mr. Stewart is chargeable with such knowledge.

The questions upon the furniture in the Metropolitan Hotel, and the claims upon it, are next to be considered. The circumstances in regard to the chattel mortgages upon this property, given to Mr. Stewart, have been fully stated, and will be referred to as may be necessary. On the 24th of January and the 3d of February, 1871, Oechs & Co. had obtained judgments against S. Leland & Co. to the amount of $5,044 12, and issued executions thereon, which were levied upon this same hotel property. These judgments were obtained in spite of the strenuous opposition of the bankrupts. On the 17th of February and the 16th of March, 1871, Batjer & Co. obtained judgments against S. Leland & Co. for $3,035 90, and issued executions thereon, which were levied on this hotel furniture. These levies were made before the filing of the petition in bankruptcy. Miller & Conger also obtained six judgments against the same firm, upon five of which, amounting in the aggregate to $4,567 08, executions were issued and levied upon the hotel furniture, shortly before the petition in bankruptcy was filed. In March, 1871, to avoid the injury to result from the action of the conflicting claimants, the bankrupt court issued to the marshal a warrant directing him to take possession of the hotel furniture, to sell it at public auction, and to bring the proceeds into court, to be kept until the further order of the court. This was done, and the proceeds of such sale, being a net sum of $26,867 29, are now in court, and represent the subject of this controversy respecting the hotel furniture. Mr. Stewart claims the proceeds by virtue of his chattel mortgage, and the renewal thereof, and by virtue of the provisions of the lease, already set forth. Miller & Conger and the other judgment creditors claim the same by virtue of their execution levy upon the property, existing when it was taken from the sheriff's possession by order of the bankrupt court, upon its warrant to the marshal. The assignee claims that all the liens and claims above mentioned are invalid under the bankrupt act, and that each of them is superseded and overridden by the title of the assignee in bankruptcy.

(1.) As to the judgments and executions specified. I refer to them first, as their consideration will be brief. They were adjudged by the district court to be invalid. This judgment was founded upon a consideration of the case of Buchanan v. Smith, 16 Wall. [83 U. S.] 277. The construction generally given to that case, when this judgment was rendered, was much modified by the subsequent case of Wilson v. City Bank, 17 Wall. [84 U. S.] 473. If that case had been before the learned judge who decided the present one in the district court, I do not doubt that he would have

held, as I do, that these judgments are valid, and the executions valid liens upon the property seized. They were for just debts, due and payable, and the judgments were obtained not only without the slightest aid or concurrence of the debtors, but generally in spite of their active and unjustifiable opposition. See, also, Cook v. Tullis, 18 Wall. [85 U. S.] 332; Tiffany v. Boatman's Institution, Id. 376.

(2.) As to the chattel mortgages. Was the chattel mortgage of Mr. Stewart, and its renewal of July 8th, 1870, valid, so far as to give him a lien upon the hotel property in preference to an execution creditor or a bona fide purchaser? The statute of New York by which this subject is governed was passed April 29th, 1833, and is as follows (Laws N. Y. 1833, p. 402, c. 279):

"Section 1. Every mortgage, or conveyance intended to operate as a mortgage, of goods or chattels, hereafter made, which shall not be accompanied by an immediate delivery, and followed by an actual and continued change of possession, of the things mortgaged, shall be absolutely void as against the creditors of the mortgagor, and as against purchasers and mortgagees in good faith, unless the mortgage, or a true copy thereof, shall be filed as directed in the succeeding section of this act.

"Sec. 2. The instruments mentioned in the preceding section shall be filed in the several towns and cities of this state where the mortgagor therein, if a resident of this state, shall reside at the time of the execution thereof, and, if not a resident, then in the city or town where the property so mortgaged shall be at the time of the execution of such instrument. * * * *

"Sec. 3. Every mortgage filed in pursuance of this act shall cease to be valid, as against the creditors of the person making the same, or against subsequent purchasers or mortgagees in good faith, after the expiration of one year from the filing thereof. unless, within thirty days next preceding the expiration of the said term of one year, a true copy of such mortgage, together with a statement exhibiting the interest of the mortgagee in the property thereby claimed by him by virtue thereof, shall be again filed in the office of the clerk or register aforesaid, of the town or city where the mortgagor shall then reside."

It is objected, in the present case (1st) that these mortgages and renewals were all filed in the office of the register of the city and county of New York, and that none of them were filed in the towns of New Rochelle or Mount Vernon, in Westchester county, whereas the mortgagors were all residents of the state, and residents of the towns in Westchester county named, and none of them were residents of the city of New York; (2d) that the last two mortgages are defective in not having a sufficient specification of the property embraced, the reference to a schedule

filed in 1867, and of property which was continually wearing out and being replaced, not being sufficient; (3d) that there is, in the renewal of July 8th, 1870, no sufficient statement either of the property remaining subject to the mortgage or of the interest of the mortgagee in it, that is, of the amount of his mortgage debt.

The first and the third of these objections I consider valid ones. As to the omission to file in the proper office, the case is quite plain. It is proved, beyond question, that the residence of the mortgagors was in Westchester county. The peremptory condition, therefore, of the statute, by which alone validity is given to the mortgage, is wanting. In its absence, the statute declares that the mortgage shall be absolutely void. This proof must be affirmatively made by the mortgagee, and, in a case where there was no evidence of the residence of the mortgagor, the mortgage was held to be void. Smith v. Jenks, 1 Denio, 580. If there be an erroneous recital, in the mortgage, of the residence of the parties, it does not relieve the case. It might operate as a waiver or an estoppel as to the mortgagor; but, the statute was enacted for the benefit of creditors, and no agreement of the debtor can estop them or control their rights. Chandler v. Bunn, Lalor's Supp. 167. The statute has imposed a rigid and unbending condition, to wit, a filing in the place where the mortgagor actually resides, as a preliminary to the validity of the mortgage. Whether this condition is wise or otherwise, whether convenient or difficult of performance, is not for the courts to say. The statute exacts it, and the courts must see that it is performed.

The schedule and the specification in the renewal of July 8th, 1870, are insufficient under the statute. It is required, that, upon such renewal, to continue the mortgage in force, there shall be filed a "true copy of such mortgage, together with a statement exhibiting the interest of the mortgagee in the property thereby claimed by him by virtue thereof." This statement is intended to supply the place of a new mortgage. It might be difficult to obtain a new mortgage at the end of a year. There would be no obligation on the part of the mortgagor to execute it, and no necessary inducement to him to do so. A convenient substitute, and one within the control of the creditor, was given by the section we are considering, and this substitute should contain all the essentials of an original mortgage. It should show, especially, what was the property thus subjected, and what was the amount claimed to be an incumbrance upon it. The detailed schedule is an important part of the mortgage, essential to be presented to an inquiring creditor. This creditor is entitled to have it presented in the renewal equally as in the original. No one would contend that the requirement to refile "a copy" of the mortgage would be complied with by giving a skeleton of its contents and making further

reference to the original filed a year previously. The schedule is a part of the mortgage, and the rule is the same as to it.

Again, the specification on the refiling says: "I hereby certify that the lease within referred to still exists in full force, and the interests of the parties, and my interests, thereunder remain unchanged, except so far as the same have been altered by the payment of rent accrued." What information does this statement give to a creditor who should seek to ascertain the extent of Mr. Stewart's incumbrance? It simply informs him that the lease still exists. It does not inform him that there is $32,994 15 of rent due and unpaid, and which Mr. Stewart claims to be secured by the mortgage. It leaves him to infer that the rent has been paid promptly as it accrued. The latter would be the legitimate inference, while, in fact, the sum mentioned was in arrear. Ely v. Carnley, 19 N. Y. 496; Van Heusen v. Radcliff, 17 N. Y. 580. Grover, J., says, in the first case: "It is important to creditors to know the amount of liens as well as their existence. Hence, the act requires the filing of the instrument or of a true copy. A compliance with the act will give the creditor full information as to the property mortgaged, the amount of the debt or condition of the mortgage, and to what extent the property can be made available for the payment of his debt. When the paper fails to accomplish these purposes, it falls short of the requirement of the statute. * * * When a judgment creditor claims the property, in hostility to the mortgagee, the inquiry is—has the mortgagee complied with the statute?—if not, the statute makes his mortgage void. The cause of the omission is wholly immaterial, whether by accident or design."

I hold, therefore, that Mr. Stewart has no lien upon the proceeds of the sale of the hotel furniture, by virtue of his chattel mortgages.

(3.) As to the lien given by the lease. Much learning is found in the brief of the counsel for Mr. Stewart on this point. He strenuously insists that the lease contains in itself what amounts to a lien on the hotel furniture; and, again, that, if there has been a failure to perfect a lien, a court of equity will carry out the agreement of the parties, and give the lien agreed by them to be given.

The doctrine is certainly true, that, where parties have agreed to give a lien upon specific property, but have neglected it entirely, or have done it imperfectly, equity will, in many cases, carry out the agreement, and cause to be done what the parties agreed should be done, and what ought to be done. What is the agreement of the lease in regard to a lien or security for the rent? It is, in effect, that the Lelands will give to Mr. Stewart a chattel mortgage on their furniture for such security, and will renew and extend the same, from time to time, as shall be necessary to effect that purpose. There is no agreement that he shall have a lien except in this form. It is agreed to execute "a

first mortgage and lien upon all the furniture," "which mortgage or lien shall be a security for the payment of the rent," and, "on any default in the payment of such rent according to the terms of this instrument," the party "may at once proceed to foreclose said mortgage or lien." It is then provided, that, within thirty days prior to its expiration, the party shall execute "a renewal of said mortgage or lien, and, also, an additional mortgage, which shall be a first lien" "upon all the additional furniture." If the party fails "to so execute and deliver" "any such renewal or additional mortgage or lien," the rent shall become payable in advance. "Said mortgage or mortgages shall be a continuing lien and security for the payment of the rent hereby reserved." The expressions "mortgage" and "lien" are manifestly synonymous. The one is a repetition of the other in a new form. The tenor of the article and the detail of manner show that the lien intended to be secured was by the means of a chattel mortgage, and that the lien derived from such an instrument should be at all times "kept up." Accordingly, the article concludes: "And, to that end, said mortgage or mortgages shall be a continuing lien and security for the payment of the rent hereby reserved."

As against his debtors, Mr. Stewart has an equity which could be enforced, to apply the property or its proceeds, which occupy the position of the property, to the payment of his debt. He has not the lien of a vendor, if such could here exist. He has not the equity of a seller and former owner of the property. In what respect can his equity be distinguished from that of any prior mortgagee of a personal chattel, whose mortgage or its renewal is defective? A manufacturer sells a coach from his shop for $1,000, and takes a chattel mortgage to secure the payment of the purchase price. His equity to have his money, and to have it from the property sold, may be conceded. But he places his security in a specific form of writing, as to which the statute declares that it shall be void unless certain conditions are complied with. If he fails to comply with them, his legal and his equitable security fail together. He has embodied his equity in the form of a legal document, and he must stand upon the security thus chosen. If his vendee gives another mortgage to a creditor, who complies with the statutory requirements, or if a creditor obtains judgment against him and levies his execution upon the coach referred to, no plea of a prior equity will avail the seller. His claim is postponed to that of the other creditor. It is not necessary to cite cases to sustain this position. In the view I take of this branch of the case, Mr. Stewart has not, and never had, a lien upon the hotel furniture or its proceeds, which would avail him against other creditors in a condition to contest it.

The considerations last mentioned furnish

an answer to the suggestion, that, by the non-payment of the rent according to the terms of the chattel mortgage, the mortgage became forfeited and the title to the property became absolute in Mr. Stewart. It is not necessary to examine the elaborate legal argument on this point, or to refer to the authorities. As against creditors and purchasers, Mr. Stewart had no mortgage. The statute condemns his security as "absolutely void." No language can be more explicit. No title by forfeiture can pass by or through an instrument which has not, and could never have had, a legal existence. Ely v. Carnley, 19 N. Y. 498. To hold that the title to personal property becomes absolute in the mortgagee upon failure to comply with the terms of the mortgage, in the sense that a subsequent purchaser or execution creditor cannot contest the first mortgage, would work an absolute nullification of the statute of 1833. By subjecting the property to the lien and claim of subsequent parties, the statute emphatically declares that the title is not absolute in the first mortgagee. Ely v. Carnley, supra.

The further question remains, of the right of the assignee to maintain this action. Mr. Stewart's counsel contends, that the assignee does not represent the creditors but the bankrupt only, and that, if his client's title is defective, the assignee cannot impeach it.

As to the right of the assignee to maintain an action to recover back the value of the real estate conveyed to Mr. Stewart by the Lelands, the case is provided for by the first clause in section thirty-five of the bankrupt act. It is there enacted, that, if any person, being insolvent, with a view to give a preference to a creditor, shall make any payment or conveyance of any part of his property, such creditor having reasonable cause to believe such person to be insolvent, and that such payment or conveyance "is made in fraud of the provisions of this act," "the same shall be void, and the assignee may recover the property or the value of it from the person so receiving it." It has been shown already, that S. Leland & Co. were insolvent in January and February, 1871, in which months the deeds of the real estate were delivered to Mr. Stewart. Their insolvency was complete. It was hopeless and irretrievable, unless they could obtain from Mr. Stewart that to which they had no legal right, and which, in fact, they did not obtain—a four years' renewal of the lease of the Metropolitan Hotel. Knowing this to be their condition, a conveyance by them to Mr. Stewart, of $43,-000 worth of real estate, in payment of a precedent debt, was, in law, a conveyance with intent to give him a preference over their other creditors. They gave to him in a measure which they knew they could not give to all. The case would have been very different if Mr. Stewart had paid money or advanced value at the time. Such a transaction by their debtor, in an honest effort to

sustain himself, is not forbidden. See Cook v. Tullis and Tiffany v. Boatman's Institution, supra. It is no answer to this to say, that the Lelands expected to receive a renewal of their lease, and thus to retrieve their fortunes. Any other delusive expectation, as of receiving a legacy, or of drawing a prize in a lottery, or of making a fortunate speculation in stocks, would have furnished the same answer. In neither case would it be satisfactory. The law does not act upon such assumptions. Upon a view of their actual property and of their legal rights, they knew that it was impossible to continue their business or to pay their debts. They knew they paid to Mr. Stewart more than they could pay to others. They hoped, by giving to him such a preference, to obtain a favor and advantage in return. They knew, also, that it rested entirely in the caprice of Mr. Stewart, whether he would bestow or withhold that favor. This does not relieve them from the charge of intentionally giving one creditor a preference over others. Of the knowledge by Mr. Stewart and his agent, of the state of the affairs of the bankrupt, enough has been already said. Under such circumstances, the act provides that the assignee may recover back the money or property so paid, conveyed or transferred; and it is for that purpose the present suit is brought.

As to that part of the action which relates to the proceeds of the furniture, it is insisted by the appellant that the case of Gibson v. Warden, 14 Wall. [81 U. S.] 244, and the case of In re Collins [Case No. 3,007], are authorities against the right of the assignee. The fact that this property has been converted into money does not alter the rights of the parties to it. Whatever liens there were upon the property itself follow the proceeds, and are liens upon the proceeds, to the same extent that they were upon the property itself. Astor v. Miller, 2 Paige, 68; Sweet v. Jacocks, 6 Paige, 355; Gibson v. Warden, supra.

In Bank of Leavenworth v. Hunt, 11 Wall. [78 U. S.] 391, this action by the assignee to recover goods held under a similar mortgage, that is, one void as to creditors only, was sustained. Such was, also, the case in Allen v. Massey, 17 Wall. [84 U. S.] 351. In Re Leland [Case No. 8,234], Woodruff, circuit judge, held that the mortgage in such case was void as against the assignee in bankruptcy, and that he was entitled to recover the proceeds of the property, in the same manner as would creditors, had they obtained judgment. In two other cases, the same judge has held that the assignee did not represent creditors, so far as to enable him to sue persons against whom rights of action were given to creditors by statute, as for individual responsibilities. Bristol v. Sanford [Id. 1,893]; Dutcher v. Marine Bank [Id. 4,203].

It the present instance, there were exist-

ing, at the time this action was commenced, a large number of judgments and executions which had been levied upon the property in controversy. Several of these, to wit, those in favor of Miller & Conger and those in favor of Oechs and of Batjer, have been decided to be valid judgments and to give liens upon this property. Some others are, evidently, in the same condition. This brings the case within the rule laid down in the Case of Collins, supra, and would justify the action, although the assignee does not claim by virtue of those judgments and executions, but seeks to avoid them. They do exist, however, and are valid liens, and are by law represented by the assignee. I think they sustain the right of action of the assignee as against the fraudulent mortgages.

Again, the assignee has an unquestioned standing in court upon the point of the real estate conveyances. It is not unreasonable that all the points respecting the disposition of the trust funds, and of the conflicting claims of parties to the fund, brought before the court, and which must ultimately be decided by it, should now be passed upon. It is to the advantage of every one that that course should be taken.

My conclusions are: (1.) That the real estate conveyances to Mr. Stewart are void, and that he must make a reconveyance of the property to the assignee, and, in case of his inability to do so, pay the value thereof, which is proved to be the sums at which they were credited in account to S. Leland & Co. (2.) That the chattel mortgages of Mr. Stewart upon the hotel furniture are void. (3.) That the judgments and executions of Miller & Conger, and Oechs, and Batjer are valid, and were liens on the hotel furniture. (4.) That from the fund produced by the sale of the hotel furniture, there be distributed and paid in payment of the judgments of Miller & Conger, and Oechs, and Batjer, the sums due upon them respectively, according to their legal priorities. (5.) That the attorneys and counsel of the said judgment creditors, defendants, be paid their taxable costs only out of said fund. (6.) That the residue, if any, be paid to the assignee, for the purposes of the trust. I see no reason for requiring the payments to the judgment creditors to be made by the assignee, or that the fund in question should pass through his hands for that purpose. Let the same be made by the clerk in whose hands the funds now are. The attorney and counsel of the assignee is entitled to be paid his taxable costs of suit, and a reasonable allowance for counsel fees. Such costs and counsel fees are to be paid from the proceeds of the real estate, or from the residue of the furniture fund remaining after paying the execution liens, and are not to diminish the fund for the payment of such executions.

[On appeal to the supreme court, the decree of this court was reversed. 101 U. S. 731. See, also, Case No. 8,228.]